IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Magistrate Judge Boyd N. Boland

Civil Action No. 03-cv-01690-WDM-BNB

RYAN E. BECK,

Petitioner,

v.

E.J. GALLEGOS,

Respondent.

_____

**RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**
_____

This matter is before me on the **Application for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241 by a Person in Federal Custody** (the "Application"), filed by Ryan Beck (the "petitioner") on September 4, 2003. The respondent filed "Respondent's Answer to Order to Show Cause, Responding to Petition Pursuant to 28 U.S.C. § 2241" (the "Answer") on December 10, 2003, and the petitioner filed a "Traverse to Respondent's Answer" (the "Traverse") on January 7, 2004. For the following reasons, I respectfully RECOMMEND that the Application be DENIED.

**I.  BACKGROUND**

The petitioner was an inmate at the Federal Correctional Institution in Pekin, Illinois ("FCI Pekin") from December 20, 1995, through August 23, 2002. *Answer*, Attachment A4.[1] The

---

[1] The Answer has numerous attachments. Directly after the text of the Answer, the respondent has attached several papers labeled as A-1 through A-6 (the "Papers"). I do not cite to the Papers in this Recommendation. After the papers, the respondent has attached the Declaration of Theresa Montoya (the "Declaration"). The Declaration is not labeled. Attached to

petitioner was transferred from FCI Pekin to holdover status at the United States Penitentiary in Terre Haute, Indiana ("USP Terre Haute"), from August 23 through December 4, 2002.  Id.  The petitioner is currently detained at the Federal Correctional Institution in Florence, Colorado. *Memorandum of Law* (in support of Application), p. 8.

On September 20, 2002, while the plaintiff was at USP Terre Haute, an incident report was issued concerning an alleged violation involving the petitioner while he was at FCI Pekin. *Answer*, Attachment A5.  The incident report charged the petitioner with committing Offense Code 212: Encouraging a Group Demonstration on August 19, 2002, and states:

> On 9/20/02 an SIS investigation was completed which revealed on 8/19/02, inmate Ryan Beck, #10053-026 was identified by reporting staff, captured on video surveillance and identified through comprehensive interviews, as a leader in orchestrating a racially motivated group demonstration during the evening meal in the dining hall.  Specifically, you were observed directing black inmates to sit in an area normally occupied by white and Hispanic inmates causing several to either leave the dining room or look for other seating.  These actions caused tension among the inmate population to escalate to a potentially volatile level which filtered into Recreation and resulted in a stand-off between white and black inmates.  Subsequently, the institution deemed it necessary to conduct a complete recall and lockdown of the institution.  You also admitted participation by stating you did it to prove a point and you also stayed at the table for the entire meal. . . .

Id. at pp. 1-2.

The petitioner was provided with a copy of the incident report on September 26, 2002. Id. at p.1.  On September 27, 2002, the Unit Disciplinary Committee ("UDC") held a hearing on the charge.  Id. at p. 3.  At the UDC hearing, the petitioner requested that the videotape of the

---

the Declaration are several exhibits, labeled A1 through A10.  When I cite to Exhibits A1 through A10, I am referring to the attachments to the Declaration, not to the Papers labeled A-1 through A-6.

2

incident be viewed because, the petitioner alleged, it would prove his innocence. Id.; *Memorandum of Law*, pp. 1-2, 3. Due to the seriousness of the charge, the UDC referred the matter to a Disciplinary Hearing Officer ("DHO") for further processing. *Answer*, Attachment A5, p. 3. The petitioner was provided with a Notice of Discipline Hearing Before the Discipline Hearing Officer (the "Notice") on September 27, 2002. Id. at Exhibit A6. He was also advised of his rights. Id. at Exhibit A7. The petitioner requested in writing on the Notice that the surveillance videotape be viewed because "[i]t can show that I was not involved." Id. at Exhibit A6.

The DHO hearing was conducted on October 4, 2002. Id. at Exhibit A9, p. 1. The Discipline Hearing Officer Report (the "DHO Report") indicates that the petitioner stated that "the charges are false. I came in and sat down. I ate my meal and left. There were no problems at Pekin. No one directed anyone to sit. There was no stand off and no one was directing anyone to sit anywhere." Id. When confronted about his alleged admission to the investigative officer that he participated in the incident to "prove a point," the petitioner denied being involved in the disturbance. Id. When questioned about the eyewitness account of a counselor, the petitioner accused her of lying. Finally, the petitioner stated that he wanted to review the surveillance videotape. Id.

The DHO Report states that the DHO considered the following evidence: (1) an investigative report from G. Pagli, SIS, dated September 20, 2002; (2) a memorandum from R. White, Unit Manager, dated September 27, 2002; and (3) one handwritten page, submitted by the petitioner. Id. at p. 2. The DHO found that the petitioner committed the act as charged and imposed sanctions, including the disallowance of twenty-seven days of good time credits. Id. at

pp. 2, 4. The DHO based his finding on G. Pagli's investigative report, which revealed the following:

> [O]n August 19, 2002 at approximately 6:18 a.m., at FCI-Pekin, Illinois, the Control Center announced a body alarm activation in Food Service where two inmates were observed fighting. The inmates that were fighting was [sic] a Black inmate and a White inmate. Throughout the day, staff received information that a heightened level of racial tension between the Black and White inmates was present following the incident in the Dining Room that morning. Following a clear institutional 4:00 p.m. count that day, a recreation move was announced and staff observed approximately 250 inmates go to recreation. The evening meal began and the first several units were called. As the evening meal progressed, staff observed several Black inmates, positioned along the west walkway, leading to the Dining Room, directing other Black inmates to enter on the side that is normally voluntarily occupied by White inmates. The SIS Report further reveals that Counselor Doris Haymon, submitted information to the SIS, stating that on August 19, 2002 at approximately 5:00 p.m., she observed you enter the Dining Room and sit in the section normally occupied by White inmates. Counselor Haymon remained there during the duration of the meal and as other Black inmates entered the Dining Room, you directed them to sit in the same area. Counselor Haymon further stated that you continued to direct Black inmates where to sit during the entire meal, until mainline closed. She specifically stated that you directed other Black inmates to sit at a table, even though they were finished eating, until another Black inmate could come and sit at the table as the other got up. She reports that you were laughing at staff who were observing you and your actions. She states that it was as though you were taunting staff in an attempt to intimidate them.

Id. at pp. 2-3.

The DHO stated that he considered the petitioner's denial of the charge and found that it conflicted with the investigative report and with the petitioner's previous statement that he "did it to prove a point." Id. at p. 3. As to the petitioner's claim that the eyewitness, Counselor Hayman, was lying, the DHO found that "the staff members were merely acting in the routine

4

performance of their duties and have nothing to gain from fabrication of the charge," whereas the petitioner had reason "to avoid the consequences of [his] actions." Id.

The DHO addressed the petitioner's request for the surveillance videotape as follows:

> The DHO considered [the request] and notes that the SIS Report reflects that you were observed on tape directing inmates where to sit. The DHO is basing the decision on the eyewitness account of staff. You further state the Incident Report shows you unassigned and at the time of the interview you worked at CMS. The DHO finds that this is possible, but has nothing to do with confirming or refuting the charge. At the time the report was written, you were unassigned.

Id. at pp. 3-4.

The petitioner brings one claim for denial of his procedural due process rights. Claim One alleges that the petitioner was denied due process because (1) the DHO refused to allow him to present documentary evidence; (2) prison officials failed to provide the petitioner written notice of the charges against him within twenty-four hours after the staff became aware of the petitioner's involvement in the incident; and (3) prison officials failed to provide the applicant with a UDC hearing within three working days after staff became aware of the petitioner's involvement in the incident. *Complaint*, p. 3; *Memorandum of Law*, p. 2.

## II. ANALYSIS

To meet the standards of due process in a disciplinary proceeding, a prisoner is entitled to:

> (1) "written notice of the charges" against him at least twenty-four hours before the hearing; (2) the opportunity "to call witnesses and present documentary evidence in his defense, when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals"; and (3) a "written statement of the factfinders

5

> as to the evidence relied on and the reason for the disciplinary action" taken.

Smith v. Maschner, 899 F.2d 940, 946 (10th Cir. 1990) (quoting Wolff v. McDonnell, 418 U.S. 539, 563-66 (1974)).

### A.  Notice of Disciplinary Charges

The petitioner claims that prison officials violated his due process rights by failing to provide him with written notice of the charges within twenty-four hours after the staff became aware of the petitioner's involvement in the incident. The petitioner argues that prison officials were required to meet the twenty-four hour deadline pursuant to 28 C.F.R. § 541.11. The process due to an inmate with regard to a disciplinary proceeding is dictated by the Supreme Court's decision in Wolff v. McDonnell, not by Code of Federal Regulations. The Wolff decision does not require that prison officials provide an inmate with notice of the charges against him within twenty-four hours after they become aware of the inmate's involvement in an incident; instead, Wolff requires only that written notice of the charges against the inmate be provided to him at least twenty-four hours before the disciplinary hearing. Here, the petitioner was provided notice of the charges on September 27, 2002. The disciplinary hearing did not occur until October 4, 2002. Therefore, the petitioner had ample notice under Wolff.

### B.  Timing of UDC Hearing

The petitioner also claims that prison officials violated his due process rights when they failed to comply with 28 C.F.R. § 541.11, which requires a UDC hearing within three working days after staff becomes aware of an inmate's involvement in the incident. Wolff does not require a UDC hearing.

### C.  Presentation of Evidence

The petitioner claims that on August 20, 2002, SIS Lt. Pagli played a videotape of the incident for the petitioner, and argues:

> Lt. Pagli pointed out an unknown inmate and stated that it was the applicant. Applicant immediately pointed out to Lt. Pagli that the inmate in question was in fact not applicant. Lt. Pagli paused the video tape and compared the unknown inmate with applicant. After making the comparison between applicant and the unknown inmate on the video tape Lt. Pagli aggreed [sic] that the inmate in question on the video was not applicant.

Id. at p.3.

At both the UDC hearing on September 27, 2002, and the DHO hearing on October 4, 2002, the petitioner requested that the videotape of the incident be presented as evidence. His requests were denied. Id. at pp. 3-4. The petitioner claims that his "procedural due process right to present documentary evidence was violated when the DHO refused to view the video tape of the alleged incident, after applicant had timely made this request that the video tape of the alleged incident be viewed by the DHO at the U.D.C. hearing held prior to the DHO hearing." *Memorandum of Law*, filed September 4, 2003, p. 4, ¶ 1.

The Tenth Circuit Court of Appeals addressed a similar claim in Griffin v. Brooks, 13 Fed.Appx. 861, 2001 WL 788637 (10th Cir. July 12, 2001). In that case, Griffin was charged with engaging in a sexual act. He was granted a disciplinary hearing before a DHO. The DHO considered a surveillance videotape of the incident as part of the evidence relied upon to find Griffin guilty. Griffin, however, was not permitted to view the videotape. Griffin brought a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 alleging that the videotape was

7

exculpatory and that the prison officials violated his due process rights by failing to allow him to view it.

The Tenth Circuit summarized Griffin's due process rights as follows:

> We first note that, because federal prisoners have a liberty interest in receiving good-time credits, the deprivation of such must comply with due process. Where a prisoner believes he was denied a meaningful opportunity to contest the charges against him due to a disciplinary board's refusal to allow the prisoner access to relevant materials, the challenge is one of procedural due process rather than sufficiency of the evidence. The denial of access to evidence used by prison officials to prove the commission of an offense may infringe an inmate's right to know what evidence is used against him and marshal the facts in his defense. . . .
>
> When a prisoner alleges a colorable *Brady*[2] violation, minimum due process requires that the district court conduct an *in camera* review of the entire investigatory file (not only the material relied on to find guilt) to determine whether or not exculpatory information existed.

Id. at 864 (quotations and citations omitted).

The circuit court in Griffin acknowledged that the district court did not address the alleged Brady violation and did not conduct an *in camera* review of the videotape. However, it held that the district court's failure to examine the videotape for exculpatory material was harmless error because Griffin admitted to an *attempted* sexual act, and that under prison regulations an attempted act was considered the same as commission of the act.

Similarly, in Piggie v. Cotton, 344 F.3d 674 (7th Cir. 2003), an inmate complained that his due process rights were violated when the disciplinary board refused to permit him to view a

---

[2]Brady holds that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady v. Maryland, 373 U.S. 83, 87 (1963).

videotape which he claimed contained exculpatory evidence. The district court in Piggie failed to conduct an *in camera* review to evaluate whether the videotape was exculpatory and failed to assess whether the state had a legitimate security reason to withhold the tape.

On appeal, the Seventh Circuit Court of Appeals explained that the function of the Brady rule in prison disciplinary proceedings is "to insure that the disciplinary board considers all of the evidence relevant to guilt or innocence and to enable the prisoner to present his or her best defense." Id. at 678. "Accordingly an inmate is entitled to disclosure of material, exculpatory evidence in prison disciplinary hearings unless such disclosure would unduly threaten institutional concerns." Id. The Seventh Circuit found that the record before it did not demonstrate that the videotape lacked exculpatory value nor had the state asserted that allowing the petitioner to view the tape posed any security risk. The case was remanded to the district court for determination of these issues.

Pursuant to Griffin and Piggie, I determined that it was necessary to conduct an *in camera* review of the videotape to determine whether it is potentially exculpatory. I further determined that an evidentiary hearing was necessary to determine whether security concerns justified withholding the videotape from the petitioner. Finally, because the respondent contends that the petitioner admitted that he committed the act and the petitioner denies making such an admission, I determined that it was necessary to take evidence to resolve this factual dispute. I held a hearing on these issues on June 13 and August 8, 2005.

Lt. Pagli, the Special Investigative Supervisor at the prison in Pekin, testified that the security system at Pekin at the time of the incident was (and still is) digital. The digital images are overwritten after a certain amount of time unless it appears that the recorded incident will result in

criminal proceedings. The digital images are not saved if only administrative proceedings are likely. At the time of the incident at issue here--August 19, 2002--digital images were saved for approximately one week.

Lt. Pagli's undisputed testimony establishes that the digital images of the incident were overwritten on approximately August 26, 2002--one month before the petitioner requested that the DHO view them.[3] Because the evidence establishes that the digital images were destroyed before the petitioner requested that the DHO view them, the alleged due process violation is not based on exculpatory evidence *that is still in the government's possession* pursuant to Brady. Rather, the violation alleged here is based on the government's *failure to preserve* potentially exculpatory evidence. Failure to preserve potentially exculpatory evidence is governed by Arizona v. Youngblood, 488 U.S. 51 (1988). See Godlock v. Fatkin, 84 Fed.Appx. 24, 29, 2003 WL 22954301 (10th Cir. December 16, 2003).

Failure to preserve potentially exculpatory evidence does not constitute a due process violation unless the evidence was destroyed in bad faith. Id. at 28 (citing Arizona v. Youngblood, 488 U.S. 51, 57-58 (1988)). The images at issue here were overwritten in the normal course of business approximately one month before the petitioner requested that the DHO view them. There is no evidence that prison officials acted in bad faith when they overwrote the

---

[3]I note that the petitioner testified that he asked to view the tape when Lt. Pagli interviewed him about the incident on August 20, 2002. He further testified that Lt. Pagli showed him the tape at that time. There is no evidence that the petitioner requested on August 20, 2002, that the tape be preserved as evidence, however See also *Memorandum of Law*, p. 3. To the contrary, the petitioner testified that he first requested that the tape be viewed by the DHO at the UDC hearing on September 27, 2002. See also id.

10

digital images. Absent bad faith, the respondent's failure to produce the images does not constitute a violation of the petitioner's procedural due process rights.

### III.  CONCLUSION

I respectfully RECOMMEND that the Application be DENIED.

FURTHER, IT IS ORDERED that pursuant to 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), the parties have 10 days after service of this recommendation to serve and file specific, written objections. A party's failure to serve and file specific, written objections waives *de novo* review of the recommendation by the district judge, Fed. R. Civ. P. 72(b); Thomas v. Arn, 474 U.S. 140, 147-48 (1985), and also waives appellate review of both factual and legal questions. In re Key Energy Resources Inc., 230 F.3d 1197, 1199-1200 (10th Cir. 2000). A party's objections to this recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review. United States v. One Parcel of Real Property, 73 F.3d 1057, 1060 (10th Cir. 1996).

Dated September 26, 2005.

BY THE COURT:

/s/ Boyd N. Boland
United States Magistrate Judge